STATE OF NORTH CAROLINA v. LENN EDWARD SPIVEY

No. 9010SC648

(Filed 7 May 1991)

**1. Constitutional Law § 248 (NCI4th)— discovery—delivery of exculpatory statement delayed—no denial of due process**

A defendant in a homicide prosecution was not denied due process by the delivery to him of an exculpatory statement by a witness the week the trial began. The statement was not suppressed, rather, its delivery to defendant was delayed; defendant received the statement on 25 August and requested and received on 29 August a continuance until 30 August; the defense announced on 30 August that it was ready to proceed; the statement was used to elicit both impeaching

**STATE v. SPIVEY**

[102 N.C. App. 640 (1991)]

and exculpatory statements during the cross-examination of the witness; and defendant's cross-examination pertaining to the prior statement constitutes at least fifteen pages of the trial transcript.

**Am Jur 2d, Depositions and Discovery §§ 428, 450-454.**

2. **Criminal law §§ 329, 334 (NCI4th) — severance of offenses and defendants — denied — no error**

Defendant waived any right to severance of the offenses of rape and murder by not renewing his motion to sever at any time after his pretrial motion was denied. There was no merit to his assignment of error to the joining of defendants. N.C.G.S. § 15A-927(a) (1987).

**Am Jur 2d, Trial §§ 9, 17-24.**

3. **Homicide § 30 (NCI3d) — second degree murder — evidence of elements of first degree murder — no error**

The trial court did not err by submitting second degree murder to the jury, even assuming that the evidence establishes all of the elements of first degree murder. A defendant in a capital case is not prejudiced when the State elects to abandon the capital offense. An indictment for murder includes both first and second degree murder, and there is no error as long as there is substantial evidence supporting the offense submitted.

**Am Jur 2d, Homicide §§ 525 et seq.**

4. **Homicide § 21.7 (NCI3d) — second degree murder — evidence sufficient**

There was sufficient evidence of second degree murder where the evidence supported a finding that defendant and two others acted in concert to commit acts, specifically the repeated striking of the victim's face, which evidenced wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and minds regardless of social duty and deliberately bent on mischief.

**Am Jur 2d, Homicide §§ 53, 245.**

APPEAL by defendant from judgment entered 6 September 1989 in WAKE County Superior Court by *Judge J. B. Allen, Jr.* Heard in the Court of Appeals 18 January 1991.

*Lacy H. Thornburg, Attorney General, by John R. Corne, Special Deputy Attorney General, for the State.*

*McMillan, Kimzey & Smith, by Duncan A. McMillan, for defendant-appellant.*

GREENE, Judge.

On 9 December 1988, defendant was charged with first-degree rape and first-degree murder. At the close of the State's evidence at trial, the State voluntarily dismissed the charge of first-degree rape, and further informed the court that it would dismiss the charge of first-degree murder and proceed with second-degree murder. On 6 September 1989, the "death qualified" jury found defendant guilty of second-degree murder. Defendant appeals from a judgment entered 6 September 1989, imposing a prison term of not less than forty-five years nor more than fifty years.

The victim's body was found on 9 July 1979 in the weeds around a cul-de-sac off Turf Grass Road in Wake County. At trial the State presented the testimony of Dr. Hudson, an expert in forensic pathology who, in July of 1979, was the Chief Medical Examiner for the State of North Carolina. Dr. Hudson assisted in the investigation of the victim's death and also conducted the autopsy on the body. He testified that there were at least four superficial cuts on each of the victim's thighs, and that, in his opinion, the cuts were made near the time of death. In Dr. Hudson's opinion the cuts were caused by a sharp object, most likely a knife. Dr. Hudson further testified that the victim had sustained multiple fractures to the right side of her face and extending to the left cheek. In his opinion, these fractures were caused by a blunt object and could have been caused by a person's fist or by the butt of a stout knife. Dr. Hudson stated that it was difficult to believe such injuries could be caused by a single blow. The cause of death, in Dr. Hudson's opinion, was a blunt force injury to the head.

In the fall of 1987, Phillip Bruce Price contacted the Wake County Sheriff's Department contending he had witnessed the events leading up to the victim's death. At trial, Price testified that in late June or early July of 1979, he had been fishing and was walking home along a path. He was crossing over some boulders in the path when he heard a woman who "sounded like she was upset." Price saw a car parked on the pavement of the cul-de-sac. The

car doors were open and inside Price saw the defendant and Sylvester Holden in the front seat, with defendant in the driver's seat. Dwight Goodson and the victim were in the back seat. The victim was naked from the waist down. Price knew defendant, Holden and Goodson because he had attended school with them.

Price testified that he saw Holden get on his knees on the front seat, facing the back seat. He then saw "hands flying like, as if fists were being thrown," and he stated that "[t]his went on for probably ten to fifteen seconds." He specifically remembered seeing Holden's "hands flying." During this time, the victim was on her back in the back seat, and "it looked as if [Goodson] was holding her legs to keep her from getting away or whatever, because it looked to me like she wanted to get away." "Then [Holden], after there was an exchange of blows with her in the upper body region, reached in the glove compartment and took out a knife. . . ." Holden handed the knife to defendant who turned around and "made a motion like he was striking at her."

Defendant and Goodson then pulled the victim from the car and dragged her into the weeds. They then got back in the car and drove away. After they were gone, Price walked to within ten feet of the victim's body. She was still naked from the waist down, and Price observed a lot of blood about her body. Price then walked home and told no one of what he had seen until the Fall of 1987 because he was "scared to death."

The State also presented the testimony of Sylvester Holden. Holden was also charged with first-degree murder and first-degree rape, but was not joined as a defendant in this trial. Holden testified that defendant picked him up in his car on the day in question, and then picked up Goodson. Defendant was driving, Holden was in the front on the passenger side, and Goodson was in the back seat. They went to a club called Dunn's Disco, and Holden stayed in the car while defendant and Goodson went inside. Shortly, defendant and Goodson walked out of the club with a female who was unknown to Holden. Goodson and the female got in the back seat and defendant got in the driver's seat of the car. After driving some distance, defendant pulled off the road. Defendant and Goodson then took turns having sexual intercourse with the female in the back seat. Defendant then got out of the car as he obtained a knife from the floorboard. He told the female to get out of the car, and "he slapped her up side the head as she was getting

out." Defendant and the female then walked to the back of the car and defendant began "arguing with the female and, and I noticed that he had slapped her head." Holden heard defendant say that "he was going to leave her down there." Defendant and Goodson, who had been standing beside the car, got back in the car and defendant began to drive away. As they were driving off, defendant said "that, that that bitch, that old bitch won't shit no way, ain't shit no way but an old whore. . . ."

Dwight Anthony Goodson was also charged with first-degree rape and first-degree murder, and he was joined as a defendant with defendant Spivey. Goodson was found guilty of second-degree murder. Goodson appealed separately and his conviction was upheld by this Court in *State v. Goodson*, 101 N.C. App. 665, 401 S.E.2d 118 (1991). The present appeal concerns only defendant Spivey.

Neither defendant offered evidence at trial.

---

The issues are: (I) whether defendant was prejudiced by the State's failure to provide defendant with impeaching and exculpatory information in its possession until the week of trial; (II) whether the trial court erred by allowing the State's motion to join defendants Spivey and Goodson and by denying defendant's motion to sever offenses; (III) whether there was sufficient evidence to submit second-degree murder to the jury; (IV) whether the trial court erred in allowing the State to seek a conviction of second-degree murder with a "death qualified" jury; (V) whether the trial court erred in allowing the State to impeach its own witness, Sylvester Holden; (VI) whether the trial court erred in allowing the jury to consider Price's testimony; and (VII) whether the State's choice to submit to the jury second-degree murder instead of first-degree murder constituted the dismissal of charges against defendant such that the trial court was without jurisdiction to try this case.

I

[1] Defendant first argues that he was denied due process in that the State withheld exculpatory and impeaching evidence in violation of the holdings in *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed.2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 49 L.Ed.2d 342 (1976), after defendant made a *"Brady* motion" for discovery of such evidence. *Brady* holds "that the suppression by the prosecution of evidence favorable to an accused upon request

STATE v. SPIVEY

[102 N.C. App. 640 (1991)]

violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* at 87, 10 L.Ed.2d at 218.

Defendant refers specifically to a recorded statement made by Price during a police interview in which Price stated that Spivey did not physically do anything to the victim, and that Goodson was the one who used a knife on the victim. Defendant does not argue that the State suppressed this statement. In fact, the statement was offered into evidence and read at trial by the State. Instead, defendant argues that the State was not timely in providing the statement to defendant in that defendant received the statement on 25 August 1989, shortly before defendant's trial which began during the 25 August 1989 session of the Superior Court of Wake County.

> Recently, *United States v. Agurs*, [427] U.S [97], 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976), resolved several of the questions left unanswered by *Brady*. . . . Under *Agurs*, it appears the prosecutor is constitutionally required to disclose only *at trial* evidence that is favorable and material to the defense. Due process is concerned that the suppressed evidence might have affected the outcome at trial and not that the suppressed evidence might have aided the defense in preparing for trial. *United States v. Agurs, supra.*

*State v. Hardy*, 293 N.C. 105, 127, 235 S.E.2d 828, 841 (1977).

The federal courts have also noted that the test is not merely whether the evidence would have aided the defendant in the preparation of his case, but whether defendant was prejudiced.

> Assuming that all of this information was material within the meaning of *Brady*, the delay in disclosing it only requires reversal if "the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir.), *cert. denied*, 426 U.S. 924, 96 S.Ct. 2634, 49 L.Ed.2d 379 (1976).

*United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978), *cert. denied*, 442 U.S. 909, 61 L.Ed.2d 275 (1979) (where defendant received 500 pages of allegedly impeaching information the day before trial, defendant was unable to show how this delay prejudiced the preparation of his case).

While we strongly disapprove of delayed disclosure of *Brady* materials, that alone is not always grounds for reversal. "As long as ultimate disclosure is made before it is too late for the defendant[ ] to make use of any benefits of the evidence, Due Process is satisfied." *United States v. Ziperstein,* 601 F.2d 281, 291 (7th Cir. 1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980); *accord United States v. Allain,* 671 F.2d 248, 255 (7th Cir. 1982); *Alberico,* 604 F.2d at 1319; *United States v. Hemmer,* 561 F. Supp. 386, 391 (D. Mass. 1983), *aff'd,* 729 F.2d 10 No. 83-1379 (1st Cir. 1984).

*United States v. Warhop,* 732 F.2d 775, 777 (10th Cir. 1984). Another factor for consideration in determining whether defendant has been prejudiced by the belated discovery of *Brady* material is whether defendant requested a continuance when the material was discovered during the course of trial. *Gorham v. Wainwright,* 588 F.2d 178, 180 (5th Cir. 1979) (where prosecution revealed certain *Brady* material for first time at trial, and counsel introduced the information into evidence after requesting and receiving a ten-minute recess, court stated that defendant's failure to request a continuance "undercuts the present argument of prejudice," that being that had defendant known of the information earlier "he would have more fully prepared to exploit their exculpatory possibilities").

In the present case, the only *Brady* material defendant refers to in his brief is the prior statement made by Price to the police. However, this statement was revealed at trial and read into evidence by the State. Defendant contends that "the state's failure to provide such information until the eleventh hour" prejudiced defendant and denied him of his constitutional rights. Though defendant does not expressly make the assertion, we infer from his brief that defendant's basis for claiming prejudice is that defendant could have better prepared his case by earlier discovery of Price's statement.

The record indicates that any impeaching or exculpatory remarks made by Price were put before the jury during the State's case in chief. Furthermore, Price's statement was not suppressed but its delivery to defendant was merely delayed. Defendant received Price's statement on 25 August 1989. On 29 August 1989, before trial started, defendant requested and received a continuance until 30 August 1989. On 30 August 1989, before the jury was

empaneled and while its members were absent, the following exchange occurred:

> COURT: Let the record show that both the defendants and all the attorneys for both the defendants and the State are present. Is the State ready to empanel the jury and have opening statements and proceed with evidence?

> MS. LAMBERT: Yes, Your Honor, the State is.

> . . . .

> COURT: And is Defendant Spivey, Mr. Dodd, and Mr. McMillan ready to proceed?

> MR. DODD: He is, Your Honor, and we would also anticipate doing that. I'll do that on behalf of Mr. Spivey.

Finally, the transcript indicates that both Goodson and defendant used Price's prior statement at trial to elicit impeaching and exculpatory statements during cross-examination of Price, and that defendant's cross-examination pertaining to Price's prior statement constitutes at least fifteen pages of the trial transcript. For these reasons, we fail to find any prejudice to defendant by the State's failure to provide defendant with the statement until 25 August 1989. Accordingly, defendant was not denied due process on this ground.

## II

[2] Defendant next argues the trial court erred in granting the State's motion to join defendants and in denying defendant's motion to sever offenses.

The issue of joinder of defendants in this case was raised by Goodson in his appeal at *State v. Goodson*, 101 N.C. App. 665, 401 S.E.2d 118 (1991). Defendant here raises no argument which would require additional analysis. Therefore, we find no merit to this assignment of error for the reasons stated by this Court in *Goodson*.

As to the severance of offenses, the applicable statute provides:

> (1) A defendant's motion for severance of offenses must be made before trial as provided by G.S. 15A-952, except as provided in G.S. 15A-953, and except that a motion for severance may be made before or at the close of the State's evidence

if based upon a ground not previously known. Any right to severance is waived if the motion is not made at the appropriate time.

(2) If a defendant's motion for severance is overruled, he may renew the motion on the same grounds before or at the close of all the evidence. *Any right to severance is waived by failure to renew the motion.*

. . . .

N.C.G.S. § 15A-927(a) (1988) (emphasis added).

The record and transcript indicate that defendant failed to renew his motion to sever offenses at any time after his pretrial motion for same was denied. By statute he has, therefore, waived any right to severance of offenses. *See State v. Silva*, 304 N.C. 122, 128, 282 S.E.2d 449, 453 (1981).

### III

Defendant next argues that the evidence at trial supports only a verdict of either first-degree murder or of not guilty, and that the trial court erred in submitting second-degree murder to the jury. In the alternative, defendant argues there was insufficient evidence to support a verdict of guilty of second-degree murder.

[3] We first reject defendant's argument that the trial court erred by submitting the charge of second-degree murder to the jury on the basis that all the evidence supports only first-degree murder. In support of this argument, defendant cites *State v. Arnold*, 98 N.C. App. 518, 392 S.E.2d 140, *disc. rev. allowed*, 327 N.C. 484, 397 S.E.2d 223 (1990). In *Arnold*, defendant was convicted of second-degree murder where both first-degree murder and second-degree murder were submitted to the jury. *Arnold* holds that, under such circumstances, a defendant's due process rights are violated where the evidence establishes all the elements of first-degree murder and there is no evidence to negate premeditation or deliberation.

In the present case, even if we assume that all the evidence does establish all the elements of first-degree murder, we find no error. *Arnold* is not applicable to the present case because the trial court submitted only second-degree murder, and the jury could only find defendant guilty or not guilty of that offense. The rule generally applicable in the present situation is that "a defendant in a capital case is not prejudiced when the State elects to

abandon the capital offense, which is equivalent to a verdict of not guilty on the more serious charge, and proceeds on a lesser offense included in the bill of indictment." *State v. Mulwee*, 27 N.C. App. 366, 368, 219 S.E.2d 304, 306, *disc. rev. denied*, 288 N.C. 732, 220 S.E.2d 622 (1975). An indictment of murder includes both first-degree murder and second-degree murder, *State v. Roseboro*, 276 N.C. 185, 196, 171 S.E.2d 886, 893 (1970), *rev'd on other grounds*, 403 U.S. 948, 29 L.Ed.2d 860 (1971), and as long as there is substantial evidence supporting the offense submitted there is no error.

[4] We furthermore find sufficient evidence in the record to support a conviction of second-degree murder. Second-degree murder is the unlawful killing of another with malice, but without premeditation and deliberation. *State v. Snyder*, 311 N.C. 391, 317 S.E.2d 394 (1984).

> While an intent to kill is not a necessary element of second degree murder, the crime does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death. . . . [A]ny act evidencing [ ]wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person[ ] is sufficient to supply the malice necessary for second degree murder. Such an act will always be accompanied by a general intent to do the act itself but it need not be accompanied by a specific intent to accomplish any particular purpose or do any particular thing.

*State v. Wilkerson*, 295 N.C. 559, 580-81, 247 S.E.2d 905, 917 (1978).

The jury could find from the evidence in this case that Goodson and defendant took turns having sexual intercourse with the victim. Afterward, Goodson held the victim in the back seat while Holden repeatedly struck the victim's upper body. Defendant then obtained a knife, either from Holden or from the floorboard of the car, and struck the victim in the head, either with his hand or with the handle of the knife, as she was getting out of the car. The victim sustained multiple fractures to her face which were caused by a blunt object. The evidence places the knife in defendant's hand, and the victim was found to have multiple cuts to her legs which, according to the Chief Medical Examiner, were made near the time of death and caused by a sharp object, most likely a

knife. The Medical Examiner also stated that the cause of death was a blunt force injury to the head and that it would be difficult to believe such an injury could be caused by a single blow.

This evidence supports a finding that defendant, Goodson and Holden acted in concert to commit acts, specifically, repeatedly striking the victim's face, which evidence wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and minds regardless of social duty and deliberately bent on mischief. Thus, the jury could find from the evidence that defendant acted in concert to unlawfully kill another with malice and, therefore, committed second-degree murder.

Issues IV, V, VI and VII were raised by Goodson in his appeal at *State v. Goodson*, 101 N.C. App. 665, 401 S.E.2d 118 (1991). Defendant in the present case makes the same arguments as those made by Goodson. Furthermore, there are no factual distinctions which would require different or additional analysis. We therefore find no error in regard to these issues for the reasons stated by this Court in *Goodson*.

No error.

Judges PARKER and COZORT concur.